UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

STEVE A. GEBERT, )
)
Plaintiff, )
)
vs. ) Civil Action No. CV-98-S-1453-NE
)
THOMAS E. WHITE,[1] SECRETARY, )
UNITED STATES ARMY, )
)
Defendant. )

FILED
01 SEP 28 PM 4:15
U.S. DISTRICT
N.D. OF ALABAMA

ENTERED
SEP 28 2001

## MEMORANDUM OPINION

Plaintiff, Steve A. Gebert, is a civilian employee of the United States Department of the Army. He contends that his employer unlawfully retaliated against him for his participation in activity protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* This court previously dismissed numerous claims asserted by plaintiff,[2] and the action presently is before the court on defendant's motion for summary judgment on the two remaining claims contained in plaintiff's "Third Amended Complaint." Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the motion is due to be granted.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1]Plaintiff's complaint names Louis Caldera as defendant. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Thomas E. White is substituted, as he is the current Secretary of the Army.

[2]See the orders and memorandum opinions entered on September 18, 1998 (doc. nos. 4 & 5), and November 20, 1998 (doc. nos. 11 & 12). In addition, seven claims were dismissed by an order entered April 14, 2000 (doc. no. 53), on the joint motion of the parties.



56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## II. FACTUAL BACKGROUND

Steve A. Gebert began his employment with the United States Army during 1989, as a "Supervisory Logistics Management Specialist" assigned to the Army Missile Command's Special Management Office, Systems Support Division, located at Redstone Arsenal, near Huntsville, Alabama. Initially, his pay grade was GM-13, but he was promoted to pay grade GM-14, retaining the same job title, on June 4, 1989.[3] During October of 1994, plaintiff began working (in the same job classification) under the supervision of James Stephens, the Associate Director of the Missile Command's Logistics Support Directorate, Integrated Materiel Management Center.[4]

---

[3] Doc. no. 60, Ex. 1.
[4] *Id.*, Ex. 2, at 493.

2

On April 13, 1994, plaintiff testified as a witness in a fact-finding conference conducted by the Department of Defense, Office of Complaint Investigations (OCI).[5] He testified on behalf of Peggy Harper, another Redstone Arsenal employee who had filed an Equal Employment Opportunity ("EEO") complaint during January of that year.[6] James Stephens, who was not plaintiff's supervisor at the time of that event, also testified as a witness for the Department of Defense.[7] Plaintiff says that the following exchange occurred between him and Stephens:

> We had shook hands in the hallway before this hearing and had a short discussion, like, "Why are you here?"
>
> "Well, why are you?"
>
> "Oh, I'm here to testify in this hearing and why for?" And I did the same thing. And that's why I knew that we were on opposite sides at the time.[8]

Beginning in June of 1995, plaintiff had several conversations with co-workers Thomas Wharton and Dallas Crowell about various grievances that they had with management.[9] Wharton filed an EEO complaint on October 6, 1994,[10] and plaintiff testified on his behalf in July of 1995.[11] Crowell filed a union grievance on July 25, 1995, alleging unfair labor practices, which did not include claims of discrimination.[12] On December 6, 1995, Crowell contacted the Redstone Arsenal EEO office to complain about the temporary promotions of Belinda Leak, Nadine Masterson,

---

[5] *Id.*, Ex. 4.

[6] *Id.*, Ex. 5.

[7] *Id.*

[8] *Id.*, Ex. 2, at 554.

[9] The substance of these conversations is not entirely clear from the record. *See Id.*, Ex. 2, at 498-99, 507-08, 531, 606-07; doc. no. 69, Ex. A, at A-7-A-11.

[10] Doc. no. 60, Ex. 6.

[11] *Id.*, Ex. 2, at 492.

[12] *Id.*, Ex. 7.

Melinda Mahan, and Frank Martin,[13] and on December 7, 1995, he sent a memorandum to Becky Miller, in the MICOM EEO office, stating that he desired to file an EEO complaint against his supervisor.[14] Also, during October of 1994, several employees approached plaintiff with a check for $1,000 that they said was a retainer for him to represent them with respect to complaints that they had filed.[15] Stephens told plaintiff that accepting the retainer would be improper.[16]

Plaintiff began having problems with Stephens almost immediately after he began working under Stephens' supervision. According to plaintiff, Stephens told him not to get involved in other employees' EEO complaints, that he should stay away from troublemakers, and that plaintiff should heed his advice because he (Stephens) was responsible for plaintiff's performance appraisal.[17]

The Department of the Army uses the so-called "Total Army Performance Evaluation System" ("TAPES") to assess the performance of its civilian employees.[18] The usual rating period for Senior System Employees at the GM-13 pay grade and above, such as plaintiff, is from July 1 through June 30 of each calendar year.[19] An employee is typically evaluated by his immediate supervisor ("the rater"), who is responsible for establishing performance expectations and proposing performance appraisals and ratings.[20] The proposed rating is reviewed by a "senior rater," who is at a higher supervisory level than the rater.[21] The senior rater must approve the rating and any

---

[13]*Id.*, Ex. 8.

[14]*Id.*, Ex. 9.

[15]Doc. no. 69, Ex. A, at A-7.

[16]Doc. no. 60, Ex. 2, at 534.

[17]Doc. no. 69, Ex. A, at A-6.

[18]*Id.*, Ex. S.

[19]*Id.* at S-8. Plaintiff's actual rating period for the 1995 performance appraisal was from October 1, 1994, the date he began working for Stephens, through June 30, 1995. The rating period was extended, as discussed *infra*, to November 21, 1995.

[20]*Id.* at S-6.

[21]*Id.* at S-7.

4

proposed performance award.[22] Stephens was plaintiff's rater, and Richard Turner, Deputy Director of the Integrated Materiel Management Center, was plaintiff's senior rater.[23]

At the beginning of each rating period, the rater and employee meet to set objectives, which are documented on Department of Army ("DA") Support Form 7222-1.[24] That form is ultimately used to prepare the Senior System Civilian Evaluation Report (Form 7222) ("Evaluation Report") at the conclusion of the rating period.[25] The rater and employee meet at least once during the rating period, usually at the mid-point, to review the stated objectives and the employee's progress toward achieving those objectives.[26] At the conclusion of the rating period, the rater prepares the Evaluation Report.[27] When assessing an employee's performance, the rater decides which objectives will be rated, and assigns a rating to each, according to the following criteria:

> **EXCELLENCE** — Consistently exceeds level described by standards and documented expectations; frequently produces more and/or better than expected.
>
> **SUCCESS** — Usually performs at the level described by the standards and documented expectations. Quality/quantity of accomplishments are generally at expected levels. Strengths clearly outweigh weaknesses.
>
> **NEEDS IMPROVEMENT** — Sometimes performs at level described by standards and documented expectations. However, fails enough so that weaknesses slightly outweigh strengths.
>
> **FAILS** — Frequently fails to perform at levels described by standards and documented expectations. Rarely achieves expected results. Weaknesses clearly outweigh strengths.[28]

---

[22] *Id.*
[23] *Id.*, Ex. U.
[24] *Id.* at S-32.
[25] *Id.* at S-30.
[26] *Id.* at S-34.
[27] *Id.* at S-30.
[28] *Id.* at S-44.

The rater totals the ratings of the selected objectives, and checks the appropriate block on the form corresponding to the objectives ratings.[29] The rater forwards the completed Evaluation Report with the support form to the senior rater for approval.[30] If the senior rater agrees with the proposed rating, he checks the appropriate "Overall Performance" rating block, and provides comments about the employee's performance and potential.[31] The "Overall Performance" rating levels are defined as follows:

> **SUCCESSFUL LEVEL 1** — Ratee with no supervisory duties is rated EXCELLENCE in over 50% of Objectives and SUCCESS in remaining Objectives. Ratee with supervisory duties also must be rated Excellence on Over 50% of ALL Objectives — which must include Excellence ratings for either Organizational Management/Leadership Objective(s) or EEO/AA [Affirmative Action] Objective(s) — and SUCCESS in others. (This is level 5 in 5 CFR 430.)
>
> **SUCCESSFUL LEVEL 2** — Ratee with no supervisory duties is rated EXCELLENCE in 25-50% of rated Objectives and SUCCESS in remaining objectives. Ratee with supervisory duties also must be rated EXCELLENCE in 25-50% of ALL Objectives — which MUST include Excellence ratings for either Organizational Management/Leadership Objective(s) and SUCCESS in others. (This is Level 4 in 5 CFR 430.)
>
> **SUCCESSFUL LEVEL 3** — All ratees who are rated SUCCESS in ALL rated Objectives or EXCELLENCE in 1% through 24% and SUCCESS in remaining Objectives. Ratees with supervisory duties who were rated EXCELLENCE in any number of Objectives but SUCCESS in those for both Organizational Management/Leadership and EEO/AA.
>
> **FAIR** — All ratees who are rated NEEDS IMPROVEMENT in 1 or more Objective(s) and not rated FAILS in any Objective. (This is Level 2 in 5 CFR 430.)
>
> **UNSUCCESSFUL** — All Ratees rated FAILS in 1 or more Objective(s) — regardless of ratings assigned other Objectives. (This is Level 1 in 5 CFR 430.)[32]

---

[29] The objectives ratings levels are: "Excellence Over 50% objectives," "Excellence 25-50% Objectives," "Success All or Excellence 1-24% Objectives," "Needs Improvement 1 or More Objectives," and "Fails 1 or More Objectives." *Id.* at S-47.

[30] *Id.* at S-44.

[31] *Id.* at S-50.

[32] *Id.*

6

Stephens and plaintiff met to establish performance standards[33] for the annual performance appraisal during November or December of 1994. Although Stephens said that he and plaintiff met again in April of 1995, for a mid-year progress review and to establish a list of objectives for the remainder of the rating period,[34] plaintiff disputes that this meeting occurred.[35] At the end of the rating period, when Stephens began preparing the Evaluation Report, he was unable to locate the initialed support form documenting the objectives, and asked plaintiff for it. Plaintiff was unable to locate the document. Stephens "reconstructed" the mid-year support form by preparing a duplicate, and asked plaintiff to "backdate" it. Plaintiff refused to do so. Stephens consulted with a management and employee relations specialist, who advised him that he could either prepare the Evaluation Report without the initialed support form or extend the rating period by 120 days and provide plaintiff additional time to meet established objectives.[36] Stephens chose the latter course, and the objectives were established on July 25, 1995, and a mid-point progress review occurred on October 5, 1995. The rating period, as extended, ended on November 21, 1995.[37] Plaintiff's Evaluation Report was finalized, with the senior rater's approval of the proposed rating, on December 19, 1995.[38]

Plaintiff refused to sign the rating form,[39] even though he had received an objectives rating of "Excellence," and an overall rating of "Successful Level 2," the second-highest rating possible.

---

[33]Performance standards are "[s]tatements of the types and levels of performance expected which serve as measuring tools to be used in assessing achievements." *Id.* at S-5.

[34]Doc. no. 60, Ex. 10.

[35]Doc. no. 69, Ex. A, at A-14.

[36]Doc. no. 60, Ex. 10.

[37]*Id.*, Ex. 11.

[38]*Id.*; doc. no. 69, Ex. U.

[39]*Id.*, Ex. U.

Additionally, Stephens nominated plaintiff for a performance award. The nomination was approved, and plaintiff received a $1,500 award.[40]

In July of 1995, plaintiff's subordinates nominated him for the Integrated Logistics Support ("ILS") Manager of the Year award. When the nomination was prepared, Stephens was away from the office, and Artro Whitman had assumed Stephens' supervisory responsibilities.[41] Whitman forwarded the nomination on July 20, 1995. Upon Stephens' return to the office on July 24, 1995, however, he asked Whitman to reconsider the nomination. Stephens offered two reasons for requesting that Whitman do so: plaintiff's performance level was not sufficiently high to justify the nomination; and the award criteria required that nominees be in "pure" ILS positions, but plaintiff did not hold such a position and, thus, was not eligible.[42] Whitman withdrew the nomination. Plaintiff asked Stephens why the nomination had been withdrawn, but Stephens would not provide an explanation.

Plaintiff made initial contact with the Redstone Arsenal EEO office in June of 1995, one month prior to the withdrawal of his ILS Manager of the Year nomination.[43] The record does not indicate the basis of his original complaint. Due to a backlog in Redstone Arsenal's EEO office, the informal pre-complaint counseling process did not occur until January of 1996, at which time plaintiff included among his complaints the withdrawal of his nomination for ILS Manager of the Year. The EEO counselor was unable to resolve the complaint informally, and on March 13, 1996, plaintiff filed a formal complaint of discrimination with the EEO office.[44] The allegations, as

---

[40]*Id.*, Ex. A, at A-16.
[41]Doc. no. 60, Ex. 2, at 597.
[42]*Id.*, Ex. 2, at 627-30.
[43]*Id.*, Ex. 12.
[44]*Id.*, Ex. 13.

8

described by the EEO Officer, were as follows:

1. Performance appraisal, July 10, 1995, received December 20, 1995.

2. Mr. Stephens changed your time card and required you to sign in/out. The changes were nearly every pay period until December 1995.

3. From October 1994 until November 1995 several people, to include Messrs. Artro Whitman, Harold Rutherford, and Nelson Martin, were allowed to "sit-in" for a GM-15. You were never given that opportunity.

4. Treated less favorably by Mr. Stephens when you were only allowed to work BRAC 93, as indicated in 15 May 95 document.

5. Mr. Stephens assigned "lesser qualified" career employees to you as a source of support: Mr. Dallas Crowell vs. Gary Kennedy, Mr. Robbie Evans vs. Lee Chappelle, Ms. Carolann Bledsoe vs. Carol Bates, Ms. Stacey Hilliard vs. Carol Anderton or Michelle Scalf. This happened through December 1995.

6. Treated less favorably when Mr. Stephens failed to provide proper equipment. Requested on October 22, 1994 and November 29, 1994 in writing and continually by mouth. Upon your departure in December 1995, no equipment had been provided.

7. Treated less favorably when you had to take Chief of the Tactical Missile Consolidation rather than a more career enhancing position for which you were qualified, specifically — the selection of Artro Whitman to Associate Director of Logistics Support in November 1995 and all Division Chief positions during the FY 95 reorganization and move to the Sparkman Center and the selection of Thomas Pieplow to the BRAC 95/Strategic Planning Office.

8. Denied overtime by Mr. Stephens several times from October 1994 thru [sic] December 1995.

9. Nominated for Integrated Logistics Support Manager of the Year. Mr. Stephens pulled the award back on/about August 14, 1995.

10. On/about 11 July 1995 Mr. Kennedy was asked to leave your office; 14 August 1995, Mr. Kennedy, Mr. Crowell, and Ms. Cunningham were all asked to leave your office by Mr. Ron Walton for Mr. Stephens. Because of this, you perceive that you have been alienated from the workforce.[45]

Redstone Arsenal's EEO officer informed plaintiff, by means of a letter dated April 23, 1996,

---

[45]*Id.*, Ex. 16.

that the following allegations had been accepted for investigation:

1. Performance appraisal, July 10, 1995, received December 20, 1995 [;]

6. Treated less favorably when Mr. Stephens failed to provide proper equipment. Requested on October 22, 1994 and November 29, 1994 in writing and continually by mouth. Upon your departure in December 1995, no equipment had been provided [;] and

9. Nominated for Integrated Logistics Support Manager of the Year. Mr. Stephens pulled the award back on/about August 14, 1995.[46]

The remaining allegations were dismissed by means of a separate letter on that same date.[47] By letter dated May 19, 1996, plaintiff waived the right to appeal the dismissal of his other allegations.[48]

James C. Biggs, an investigator for the Department of Defense, Civilian Management Service, Office of Complaint Investigations, conducted a fact-finding conference on August 12, 1996. Biggs issued a Report of Investigation on October 21, 1996, concluding that plaintiff failed to provide sufficient information to substantiate his claims of retaliation.[49] The Department of the Army Equal Employment Opportunity Compliance and Complaints Review Agency rendered the Final Agency Decision on June 2, 1998, finding no discrimination.[50] Plaintiff filed this civil action on June 5, 1998.

### III. DISCUSSION

Defendant's motion for summary judgment asserts that plaintiff has not established a prima facie case of retaliation, because he has not suffered an adverse employment action; but even

---

[46] *Id.*

[47] *Id.*, Ex. 17.

[48] *Id.*, Ex. 18.

[49] *Id.*, Ex. 19.

[50] *Id.*, Ex. 20. The decision states that plaintiff initially requested a hearing before an EEOC administrative judge; however, he later withdrew the request, and asked for a final agency decision.

assuming he had sustained an adverse employment action, he still has not established a causal link between that and his protected activity. In response, plaintiff argues that his "negative" performance appraisal was an adverse employment action because, if he had received a higher rating, he would have received a higher monetary award. Plaintiff also contends that his nomination for ILS Manager of the Year was withdrawn in retaliation for his participation in protected activity.

### A.     Title VII Retaliation Claims

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a). Congress thus recognized two bases for a claim of retaliation: one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.' ... And, under the participation clause, an employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' ..."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Here, plaintiff has participated in protected activity by testifying in another employee's EEO proceeding, and by filing an EEO complaint.

### B. Elements of a Prima Facie Case

Generally speaking, a prima facie case of retaliation has three elements. A plaintiff must prove that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected activity and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

### C. Definition of an Adverse Employment Action

"An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (ADA retaliation claim); *see also, e.g., Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Gupta*, 212 F.3d at 587 (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman*, 141 F.3d at 1456). Thus, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

On the other hand, "conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII." *Bass*, 256 F.3d at 1118 (citing *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson*, 120 F.3d at 1300).

Defendant asserts that, for claims brought by federal employees, employment decisions that fall short of "ultimate employment decisions" — such as failing to hire, discharging, promoting, granting leave, or compensating — do *not* qualify as adverse employment decisions for purposes of establishing a prima facie case.[51] While that may be true with respect to claims of disparate treatment premised upon 42 U.S.C. § 2000e-16, *see, e.g., Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), it is not true with respect to claims of retaliation brought under 42 U.S.C. §2000e-3(a). *See Wideman*, 141 F.3d at 1456 n.2.

The question of whether an employee has suffered an employment action that is sufficiently

---

[51]Defendant relies upon *Williams v. West*, No. 99-14939 (11th Cir. June 19, 2000), as support for this argument. There are two problems with that, however. *Williams* involved a claim of discrimination on the basis of sex in violation of 42 U.S.C. § 2000e-16, *not* retaliation in violation of § 20003-3(a). Moreover, unpublished opinions are not considered binding precedent. *See* Eleventh Circuit Rule 36-2.

adverse to be actionable normally must be determined on a case-by-case basis, *see Bass*, 256 F.3d at 1118, *Gupta*, 212 F.3d at 587, using both a subjective and an objective standard. *See Doe v. Dekalb County School District,* 145 F.3d 1441, 1448-49 (11th Cir. 1998) (recognizing that the subjective requirement is virtually almost always satisfied and imposing an objective requirement).

In *Doe*, the court addressed an issue of first impression within the Eleventh Circuit: *i.e.*, "whether a court should view an employment action from the subjective perspective of a particular plaintiff or the objective perspective of a 'reasonable person.'" *Id.* at 1447.[52] The *Doe* court adopted an objective test: a plaintiff establishes an "adverse employment action" *only if* he "demonstrate[s] that a reasonable person in his position would view the employment action in question as adverse." *Id.* at 1449. "Any adversity must be material; it is not enough that [the contested employment action] imposes some *de minimis* inconvenience or alteration of responsibilities." *Id.* at 1453.

In *Gupta*, the Eleventh Circuit reiterated that the question of whether an employment action is sufficiently "adverse" to warrant scrutiny under Title VII's anti-retaliation provision must be analyzed under both an objective and subjective standard:

> An adverse employment action is an ultimate employment decision, such as

---

[52]One reason the issue had not previously been addressed is that,

> in most employment discrimination cases the issue of a plaintiff's subjective preference need not arise, because the plaintiff has alleged an employment action that would appear adverse to any reasonable person. Where a plaintiff has allegedly suffered termination, demotion, reduction in pay, loss of prestige, or diminishment of responsibilities, for example, a court normally has no cause to consider its standard for adversity; the relevant question in such cases is whether such patently adverse actions actually took place.

*Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998). The *Doe* case addressed a claim founded upon the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Nevertheless, as the court noted, Eleventh Circuit precedent interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the ADA "have often relied on the same 'adverse employment action' concept that is an essential element of a *prima facie* ADA case. ... We can assist our consideration of the adversity standard under the ADA, therefore, by looking to the broader experience of our court and others with employment discrimination law." *Doe*, 145 F.3d at 1448 (citations omitted).

14

> discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." ... *Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause."* ... In evaluating what actions meet that required level of substantiality, we recognize that "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" ... Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, ... using both a subjective and objective standard, *see Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998)....

*Id.* at 587 (other citations omitted) (emphasis added).

Closer to the point of this case, the Eleventh Circuit has held that *negative performance evaluations*, "standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA." *Lucas,* 257 F.3d at 1261 (citations omitted).[53]

Although plaintiff argues that he received a "negative" performance evaluation, the fact is that he received the second-highest rating possible. Moreover, he received a $1,500 award in recognition of his superior performance. Merely receiving a lower performance appraisal than expected is not an action that is objectively serious, nor sufficiently tangible to alter plaintiff's compensation, terms, conditions, or privileges of employment, deprive him of employment opportunities, or adversely affect his status as an employee. While plaintiff asserts that he would have received more money as a performance award if his rating had been higher, this allegation does not transform his highly favorable rating into an adverse employment action.

Plaintiff also alleges that the rating he received in 1995 affected his promotional

---

[53]*See supra* note 52 regarding the transparency of decisions under Title VII, ADEA, and ADA on the issue of what constitutes an "adverse" employment action.

opportunities, and that it was the reason he was not selected for a prestigious training program in 1998.[54] These contentions are unsupported. Plaintiff's superior rating did not affect his eligibility to apply for any of the opportunities he cited.

Plaintiff has also failed to establish that the withdrawal of his nomination for ILS Manager of the Year was an adverse employment action. He states that "[t]he ILS Manager of the Year award carried the opportunity to earn up to a $2500.00 monetary award."[55] Again, this action does not meet the required threshold level of substantiality to be actionable under Title VII.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's claim of retaliation in violation of Title VII must fail, and defendant is entitled to summary judgment. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 28th day of September, 2001.

_____
United States District Judge

---

[54] Plaintiff applied, and was considered, for the Department of Defense Logistic and Acquisition Management Program, in June of 1998. Doc. no. 69, Ex. A, at A-14.

[55] *Id.*, Ex. K.

16